# United States Court of Appeals for the Federal Circuit

———————————

**COAST PROFESSIONAL, INC., NATIONAL RECOVERIES, INC., PIONEER CREDIT RECOVERY, INC.,**
*Plaintiffs*

**ENTERPRISE RECOVERY SYSTEMS, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, FINANCIAL MANAGEMENT SYSTEMS, INC., ACCOUNT CONTROL TECHNOLOGY, INC., CONTINENTAL SERVICE GROUP, INC., GC SERVICES LIMITED PARTNERSHIP**
*Defendants-Appellees*

**WINDHAM PROFESSIONALS, INC.,**
*Defendant*

———————————

2015-5077

———————————

Appeal from the United States Court of Federal Claims in Nos. 1:15-cv-00207-FMA, 1:15-cv-00242-FMA, 1:15-cv-00249-FMA, 1:15-cv-00265-FMA, Senior Judge Francis M. Allegra.

----------------------------------------------------

**COAST PROFESSIONAL, INC., NATIONAL RECOVERIES, INC., ENTERPRISE RECOVERY SYSTEMS, INC.,**
*Plaintiffs*

**PIONEER CREDIT RECOVERY, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, FINANCIAL MANAGEMENT SYSTEMS, INC., ACCOUNT CONTROL TECHNOLOGY, INC., CONTINENTAL SERVICE GROUP, INC., GC SERVICES LIMITED PARTNERSHIP,**
*Defendants-Appellees*

**WINDHAM PROFESSIONALS, INC.,**
*Defendant*

————————————

**2015-5101**

————————————

Appeal from the United States Court of Federal Claims in Nos. 1:15-cv-00207-FMA, 1:15-cv-00242-FMA, 1:15-cv-00249-FMA, 1:15-cv-00265-FMA, Senior Judge Francis M. Allegra.

————————————

Decided: July 12, 2016

————————————

ROBERT J. SNECKENBERG, Crowell & Moring, LLP, Washington, DC, argued for plaintiff-appellant Enterprise Recovery Systems, Inc. in 2015-5077. Also represented by DANIEL RUBEN FORMAN, JAMES G. PEYSTER.

JONATHAN DAVID SHAFFER, Smith, Pachter, McWhorter, PLC, Tysons Corner, VA, argued for plaintiff-appellant Pioneer Credit Recovery, Inc. in 2015-5101. Also represented by MARY PAT BUCKENMEYER, NICHOLAS J. SURACE.

MICHAEL D. SNYDER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by JANA MOSES, REGINALD T. BLADES, JR., ROBERT E. KIRSCHMAN, JR., BENJAMIN C. MIZER; JOHN K. DIPAOLO, JOSE OTERO, United States Department of Education, Washington, DC.

JEREMY CHARLES MARWELL, Vinson & Elkins LLP, Washington, DC, argued for defendants-appellees Financial Management Systems, Inc., Account Control Technology, Inc., Continental Service Group, Inc., GC Services Limited Partnership. Defendant-appellee Financial Management Systems, Inc. also represented by DAVID R. JOHNSON, JASON ALAN LEVINE.

BENJAMIN G. CHEW, Manatt Phelps & Phillips, Washington, DC, for defendant-appellee Account Control Technology, Inc. Also represented by RORY EDWARD ADAMS.

EDWARD H. MEYERS, Stein Mitchell Muse Cipollone & Beato LLP, Washington, DC, for defendant-appellee Continental Service Group, Inc. Also represented by REBECCA ANZIDEI.

STEPHEN E. RUSCUS, Morgan, Lewis & Bockius LLP, Washington, DC, for defendant-appellee GC Services Limited Partnership. Also represented by ARNOLD BRADLEY FAGG.

---

Before MOORE, REYNA, and WALLACH, *Circuit Judges.*

MOORE, *Circuit Judge*.

Pioneer Credit Recovery, Inc. ("Pioneer") and Enterprise Recovery Systems, Inc. ("Enterprise") separately appeal from a decision by the Court of Federal Claims dismissing their claims against the government for lack of jurisdiction. We vacate and remand.

BACKGROUND

Since 1981, the Department of Education ("Education") has contracted with private collection agencies for services related to resolving defaulted student loans through the General Services Administration ("GSA") Federal Supply Schedule for Financial and Business Solutions. *See* 48 C.F.R. (Federal Acquisition Regulation ("FAR")) Subpart 8.4. "The Federal Supply Schedule program is directed and managed by GSA and provides Federal agencies (see 8.004) with a simplified process for obtaining commercial supplies and services at prices associated with volume buying." FAR 8.402. The GSA Federal Supply Schedule contracts at issue are indefinite delivery, indefinite quantity contracts with the government. This type of contract allows agencies like Education to order supplies and services in a streamlined process because the contractors are pre-approved and must publish their pricing and terms for each type of supply or service (called a "Special Item Number"). *See* FAR 8.402(a), (b). Orders placed against GSA Schedule contracts are "considered to be issued using full and open competition" even though they are not subject to FAR Part 15, which prescribes procedures for most negotiated contracts. FAR 8.404(a).

In 2008, Education issued a Request for Quotations ("RFQ") for debt collection services under Special Item Number 520-4 seeking to issue Task Orders to contractors under the existing GSA Schedule contract. The RFQ contained a detailed Statement of Work explaining the required activities and standards applicable to collection

on defaulted student loans and detailed how the contractors would be evaluated. The RFQ also explained that the Task Order would include a base term and options periods but that the total term of performance under the RFQ would not exceed 60 months:

> The ordering period for the task orders will be from the date of award through March 31, 2011, and an additional option period of up to 24 months. The total ordering period will not exceed 60 months from the date of the task order award. This is not a multiyear contract as defined in FAR Sub part 17.1.

J.A. 1017.[1]

Pioneer, Enterprise, and various other agencies holding GSA Schedule contracts with Education submitted proposals. In 2009, Education awarded identical Task Orders pursuant to the RFQ to Pioneer, Enterprise, and twenty other contractors. The Task Orders contained all of the standard contract details and material terms—price, duration, obligations, and various other clauses as set forth in the RFQ—though some of those terms changed from the RFQ.

The parties agree that the Task Orders contain a base term and that Section H.1 of each Task Order sets forth an Option that permits the government to unilaterally extend the term of the Task Order pursuant to that option up to 24 months for a total ordering period (base term + optional extensions) that does not exceed 60 months:

---

[1]    Unless otherwise specified, all citations to the parties' briefs and the J.A. refer to the materials in Case No. 2015-5101.

### H.1 FAR 52.217-9, Option to Extend the Term of the Task Order (March 2000) Tailored

(a) The Government may extend the term of this Task Order . . .

(b) If the Government exercises this option, the extended Task Order shall be considered to include this option clause.

(c) The total duration of the first Ordering Period of performance of this Task Order, including the exercise of any optional Ordering Periods under this clause, shall not exceed 60 months from the date of contract award, excluding any award term(s) earned.

(d) The Government may, at its discretion, exercise option periods of up to 24 months, provided that the total Task Order period of performance does not exceed 60 months from the date of the award.

J.A. 1419. This option in the Task Order parallels the FAR which it expressly cites. It is undisputed that if the government exercises an option under H.1 to extend the Task Order, no new Task Order is issued. *See* J.A. 1419. Section "H.3 FAR 52.217-8 Option to Extend Services" similarly permits the government to unilaterally require continued performance under the Task Order for up to 6 additional months. This extension provision likewise parrots the language of the FAR which it expressly cites. Education exercised its options under Sections H.1 and H.3 for both Pioneer and Enterprise, unilaterally extending their 2009 Task Orders to February 21, 2015 and April 21, 2015, respectively.

Each Task Order also included a clause entitled "H.4 Award Term Extension," which provided that the contrac-

tor could earn award-term extensions in addition to the base period and any options exercised pursuant to Sections H.1 and H.3:

> the Contractor may earn performance extensions (hereinafter called "award terms"), based upon the quality of performance during the evaluation periods. If the Contractor has an average [Contractor Performance and Continuous Surveillance ("CPCS")] rating of 75[2] or greater over the life of the Task Order, or the last 12 CPCS periods (whichever is shorter), the Government may[] award the Contractor an award-term extension in accordance with the terms of this clause in recognition of the Contractor's excellent or better quality performance.

J.A. 1419–20. Section H.4 also specified that "[a]ny award term extensions awarded under this clause will be executed in the form of a new Task Order issued by the Contracting Officer under the Contractor's then current GSA schedule contract." J.A. 1420.

In December 2014, Education began secretly auditing the contractors based on recommendations by the Government Accountability Office for improved oversight. Reviewers from Education listened to roughly one hundred phone calls that each contractor made to defaulted borrowers and counted the number of times the contractor violated consumer protection laws. Education then calcu-

---

[2] In 2011, Pioneer's and Enterprise's 2009 Task Orders were each modified via a "Modification of Contract" document to change the requisite CPCS score in H.4 from 75 to 85. The modification to the Pioneer Task Order required Pioneer's signature, but the modification to the Enterprise Task Order did not.

lated an "error rate" for each contractor based on the number of phone calls containing at least one violation. Based on their error rates, Education decided not to issue award-term Task Orders to Pioneer or Enterprise even though they scored "excellent or better" under the CPCS system.

On February 20, 2015, Education notified Pioneer and Enterprise of its decision not to issue award-term Task Orders to them. One day later, Education notified five other contractors (collectively, "the competitors") that it intended to issue award-term Task Orders to them for a period not to exceed a specified number of months. These letters, titled Notification of Award Term Extension and each signed by the Contracting Officer, expressly stated: "If the contract is extended pursuant to H.4, it will be accomplished *via a contracting action*, which will specifically identify all of the terms and conditions." J.A. 2107 (emphasis added).

In March 2015, Pioneer and Enterprise filed suit against the government in the Court of Federal Claims, based on, inter alia, Education's proposed issuance of award-term extensions under H.4 to the competitors. The complaints alleged that the Court of Federal Claims had jurisdiction over the claims under the Tucker Act, 28 U.S.C. § 1491(b)(1). The competitors intervened as defendants and they, along with the government, argued that the Court of Federal Claims lacked subject matter jurisdiction. The Court of Federal Claims dismissed the complaints. Pioneer and Enterprise appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Court of Federal Claims' dismissal for lack of subject matter jurisdiction de novo. *Distributed Sols. v. United States*, 539 F.3d 1340, 1343 (Fed. Cir. 2008). We review its factual findings for clear error. *Id.* We review its interpretation of contracts without defer-

ence, giving unambiguous contract terms their plain and ordinary meaning. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 824 (Fed. Cir. 2010). We review questions of statutory interpretation without deference. *Res-Care, Inc. v. United States*, 735 F.3d 1384, 1387 (Fed. Cir. 2013).

Under the Tucker Act, as amended, the Court of Federal Claims has bid protest jurisdiction over "action[s] by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).[3] We conclude that the proposed issuance of award-term extensions under H.4 to the five contractors to permit them to continue offering debt collection services under the GSA Schedule contract constitutes "a proposed award or the award of a contract" pursuant to § 1491 and thus the Court of Federal Claims has jurisdiction over the bid protest. The government's decision to

---

[3] We have previously interpreted "an interested party" under § 1491(b)(1) as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," based on the definition provided in the Competition and Contracting Act ("CICA"), 31 U.S.C. §§ 3551–56. *CGI Fed., Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015). And we have interpreted "in connection with a procurement or proposed procurement" as "involv[ing] a connection with any stage of the federal contracting acquisition process, including the process for determining a need for property or services," based on the definition provided in the statute governing the Office of Federal Procurement Policy, now 41 U.S.C. § 111. *Distributed Sols.*, 539 F.3d at 1346.

issue new Task Orders to contractors under the GSA Schedule contract falls within the plain language of § 1491.

There is no dispute that the award-term extension under H.4 requires the government to issue a new Task Order for the extension of debt collection services for the competitors. The Supreme Court recently held that issuance of a new Task Order against a GSA Federal Supply Schedule contract constitutes an award of a contract. *See Kingdomware Techs., Inc. v. United States*, No. 14-916, 2016 WL 3317563, at *8–9 (U.S. June 16, 2016). It is thus a protestable event under § 1491(b). *Data Mgmt. Servs. JV v. United States*, 78 Fed. Cl. 366, 371 (2007) ("The court's protest jurisdiction extends to protests of task or delivery orders placed against a GSA schedule contract."); *IDEA Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 135–37 (2006) (holding that the Court of Federal Claims has jurisdiction over protests relating to issuance of Task Orders under GSA Federal Supply Schedule contracts).[4]

---

[4]  The *Data Management* and *IDEA* decisions distinguish task and delivery orders issued pursuant to The Federal Acquisition and Streamlining Act ("FASA") of 1994, Pub. L. No. 103-355, 108 Stat. 3243, in which protests are expressly prohibited from task and delivery orders pursuant to a GSA Federal Supply Schedule contract where no similar prohibition exists. *Compare Data Mgmt.*, 78 Fed. Cl. at 371 n.4 *and IDEA*, 74 Fed. Cl. at 135–37 *with SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (holding the Court of Federal Claims lacked subject-matter jurisdiction over a protest to a task order issued pursuant to a Government-Wide Acquisition Contract, not a Federal Supply Schedule); *see also* John Cibinic, Jr., Ralph C. Nash, Jr. & Christopher R. Yukins, *Formation of Government Contracts* 1171–72

In this case, however, the Court of Federal Claims concluded that these proposed new Task Orders (for the award-term extensions) should not be considered "the award of a contract." It acknowledged that the award-term extensions would be issued as new Task Orders, but concluded that treating them as such for purposes of bid protest jurisdiction would "elevate[] form over substance." *Coast Prof'l, Inc. v. United States*, 120 Fed. Cl. 727, 734 (2015). It held that "the award-term extensions added more work to the existing contract only in the context of those task order provisions-but nothing more." *Id.*

On appeal, the government defends the Court of Federal Claims' decision arguing that using a new Task Order is a "mere formality." Gov't Br. 30. The government reasons that because the new Task Order will be subject to the same terms and conditions as the old Task Order, it should not be considered a new contract. The government argues that instead, the award-term extension issued in a new Task Order should be considered an option. Gov't Br. 27–30. And the government argues that it is well-settled that an agency's decision whether to exercise an option is a matter of contract administration which can only be challenged under the Contract Disputes Act ("CDA"). Gov't Br. 20–26. On this latter point, the government is correct. If a contractor wishes to contest an agency's decision regarding exercising an option under the contract, such a challenge is a matter of contract administration governed by the CDA. *See Jones Automation, Inc. v. United States*, 92 Fed. Cl. 368, 371–72 (2010) (failure to exercise an option is a matter of contract administration outside the court's bid protest jurisdiction); *Gov't Tech. Serv., LLC v. United States*, 90 Fed. Cl. 522,

(4th ed. 2011). We agree that Task Orders issued pursuant to a GSA Federal Supply Schedule are actions over which the Court of Federal Claims has jurisdiction.

526 (2009) (failure to exercise an option is governed by the CDA and is not a bid protest).

We cannot agree however that the award-term extension issued in the form of a new Task Order is properly treated as an option governed by the CDA. Even when a new Task Order contracts for the same work previously performed by the same contractor under the GSA Schedule contract, this new Task Order is the award of a new contract. Although the government recognizes that new rounds of Task Orders under the same GSA Schedule contract amount to a new procurement, it attempts to distinguish the award-term extension at issue from "the next round of PCA Task Orders" by arguing the award-term extensions are not the subject of a separate procurement. Gov't Br. 30 n.8. But H.4 expressly anticipates that the Task Orders issued for the award-term extensions will issue concurrently with Task Orders issued pursuant to additional rounds of procurement beyond the 60 months permitted under the 2009 Task Orders. "It is the Government's intent to time any award-term extension so that the extension period will coincide with the award date of the next round of Task Orders." J.A. 1419. That the government has preselected some of the contractors who will receive the new Task Orders through the award-term extension clause does not nullify the contractual effect of these Task Orders. Each new round of Task Orders under a GSA Schedule contract is a "proposed award or the award of a contract" falling under the plain language of § 1491. *See Data Mgmt. Servs. JV*, 78 Fed. Cl. at 371; *IDEA Int'l, Inc.*, 74 Fed. Cl. at 135–37.

The government asks us to deviate from the established rule that new Task Orders are new contracts, and instead conclude that new Task Orders resulting from award-term extensions are "akin to options." Gov't Br. 27. We do not agree that the award-term extension at issue in H.4, which requires a new Task Order to be issued, should be treated like an option. The FAR expressly defines an

Option: "Option means the unilateral right in a contract by which, for a specified time, the Government may elect to purchase additional supplies or services called for by the contract, or may elect to extend the term of the contract." 48 C.F.R. § 2.101 (definition of Option). Unlike an option, the award-term extensions cannot be issued unilaterally by the government. Instead, the award-term extensions can issue only if, inter alia, "[t]he contractor accepts the Government's target pricing and terms." J.A. 1419. Section H.4 specifies that the government "target prices for the current PCA Task Orders will apply to the award-term extension," so it is anticipated that the same pricing will apply; however, the contractor has the right to accept or reject the award-term extension. This is the opposite of a unilateral right.

The government points us to FAR 17.2, which governs the use and exercise of options. Gov't Br. 28. The government is correct that like an option, which requires written notice to a contractor, H.4 requires the government to give written notice of its intent to extend. *See* FAR 17.207(a). And like an option, the award-term extension is conditioned on the availability of funds and the requirement that the award will fulfill a government need. *See* FAR 17.207(c). All of these conditions exist for all new contracts to be issued: there must be government funds, the new Task Order must fulfill a government need, and it must be in writing.

Precedent counsels against treating Section H.4 as an option because the contract in fact has two separate options clauses already. The 2009 Task Orders contained two other provisions, H.1 and H.3, which are expressly called options. J.A. 1419. The appearance of the term "option" in only some of the provisions that extend the duration of the 2009 Task Orders indicates that the parties did not intend to treat "option" and "extension" as synonymous. *See, e.g., Diamond Coating Techs., LLC v. Hyundai Motor Am.*, Nos. 2015-1844, -1861, 2016 WL

2865704, at *3 (Fed. Cir. May 17, 2016) (explaining that a contract's use of a term in some provisions, but not others, reflects the parties' intent to limit the term in question). And as stated above, the substance of Section H.4 is different from provisions that meet the definition of "option" under the FAR. *Compare* J.A. 1419–20, *with* FAR 2.101 (defining "option" as, inter alia, a provision that the government may invoke unilaterally).

The government has not convinced us that we ought to deviate from the definitions and conditions in the FAR to conclude that the new Task Orders which would issue pursuant to an award-term extension ought to be treated as options rather than new contracts. We will not deviate from the definition in the FAR of option to contort these new Task Orders into "mere formalities" in this case.

Section 1491 gives the Court of Federal Claims jurisdiction over "the award or proposed award of a contract." We conclude that issuance of a new Task Order pursuant to a GSA Federal Supply Schedule contract constitutes the award of a contract and is thus an action over which the Court of Federal Claims has jurisdiction. We see no reason to create an exception when the new Task Orders arise from an award-term extension.

### CONCLUSION

Because we conclude that the Court of Federal Claims erred in concluding that the award-term Task Orders were not new Task Orders for purposes of § 1491(b)(1), we vacate and remand for further proceedings consistent with this opinion.

### VACATED AND REMANDED

### COSTS

Costs to Pioneer and Enterprise.